542 So.2d 1111 (1989)
CITY OF DONALDSONVILLE
v.
E. Brandt THIAC.
No. 88 CA 0319.
Court of Appeal of Louisiana, First Circuit.
April 11, 1989.
Sidney Marchand, Donaldsonville, for City of Donaldsonville.
Malcolm Dugas, Donaldsonville, for E. Brandt Thiac.
Before WATKINS, CRAIN and ALFORD, JJ.
WATKINS, Judge.
Defendant, Brandt Thiac, appeals the trial court judgment evicting him from the property of plaintiff, City of Donaldsonville. We affirm.

FACTS
The City of Donaldsonville (City) leased a building and property known as the "Garment Factory" from the South Louisiana State Fair Association on September 12, 1973. The lease was for a term of 20 years, with an annual rent of One Dollar ($1.00).
On the same day the City executed a sublease to Cute Togs of New Orleans, Inc. (Cute Togs). The sublease was executed for the express purpose of securing a garment manufacturing business within Donaldsonville which would provide employment for its citizens. In connection with the lease the City Council of Donaldsonville resolved to appropriate the sum of Forty *1112 Thousand Dollars ($40,000.00) to make necessary renovations and repairs to the Garment Factory. The sublease to Cute Togs provided for a 10 year term with an option for the lessee to renew the lease, at the same rental of Two Hundred Fifty Dollars ($250.00) per month, for two additional periods of five years each. The lease also provided that:
Lessee shall not assign or sublease the leased premises or any part thereof, without the written approval of Lessor.
It is understood, however, that this provision shall not apply to any wholly owned subsidiary of the Lessee or any other legal entity in which Lessee or its stockholders own majority interest or stock. Should Lessee so assign or sublease, it shall nevertheless remain liable to Lessor for full payment of the rent according to the terms of this lease.
Pursuant to the sublease Cute Togs operated a garment manufacturing business on the leased property from November, 1973, until March of 1984, when the business ceased operations. In April of 1984, Brandt Thiac, a former officer and employee of Cute Togs, incorporated New Hope Industries, Inc. (New Hope), in which he was the sole shareholder. New Hope leased equipment from Cute Togs and began operating a garment manufacturing business at the garment factory. Mr. Thiac, acting as president of New Hope, informally contacted the Mayor and several councilmen to verify their approval of New Hope's occupancy of the garment factory. There being no challenge to New Hope's occupancy of the garment factory, New Hope paid rent directly to the City from April 1984,[1] until July of 1985, when New Hope ceased operation of its garment manufacturing business. Thereafter Mr. Thiac, individually, continued to pay the rent directly to the City.
During his occupancy of the garment factory Mr. Thiac was unable to reestablish any productive business on the premises. As a result, the building fell into disrepair, eventually having the electricity disconnected.
In the spring of 1986 the Mayor became concerned about the non-productive use of the garment factory and began searching for a garment business which would be interested in leasing the garment factory. With Mr. Thiac's permission he showed the factory to one prospective lessee. Apparently no further negotiations occurred. Thereafter, Mr. Thiac and Mayor Bourg had several discussions in the spring of 1986 wherein Mr. Thiac expressed an interest in remaining in the garment factory and requested 60 days in order to start a new business which would employ a substantial number of local residents. Mayor Bourg testified that he consented to Mr. Thiac's request, giving him until July of 1986, to comply.
Sometime in the fall of 1986, Mr. Thiac was contacted by Melamine Chemicals concerning a possible sublease of the garment factory to Melamine. Assuming he would need the City's approval to sublease the garment factory, Mr. Thiac drafted an agreement entitled "Lease Variance" which read as follows:
Pursuant to the lease agreement between the City of Donaldsonville, and E. Brandt Thiac, any sub-leasing of part and/or all of the property located at 601 D. Thibaut Drive, Donaldsonville, Louisiana, must be approved by the City Council of Donaldsonville, Louisiana. It is for this reason that this lease variance is submitted. The following signatures attest to the fact that the lease variance is granted.
 ________________________
CLAUDE "TOBY" BOURG, MAYOR
 ________________________
C.J. BELLINA COMM. OF FINANCE
 ________________________
PRINCE DAVIS, COMM. DIST. 1
 ________________________
GEORGE SHAHEEN, COMM. DIST. 2
 ________________________
GUY PORCHE COMM. DIST. 3
*1113 Thereafter, Mr. Thiac contacted and met individually with the four newly elected councilmen[2] to discuss and procure their signatures on the variance. The councilmen signed the variance, each assuming that Mr. Thiac had a valid lease with the City. Again, Mr. Thiac did not seek formal approval by the City Council; nor did he obtain the mayor's signature on the variance.
In October of 1986, the City Council, concerned about the non-business use of the garment factory, requested that its attorney investigate what the City's position was with respect to the sublease of the garment factory. Thereafter, on December 31, 1986, the City returned the November rent payment made by Mr. Thiac, together with written notice demanding that he vacate the premises. Mr. Thiac refused to vacate the premises, asserting that he had a valid lease with the City that had not been breached. Thereafter, on January 29, 1987, in accordance with LSA-C.C.P. art. 4701, the City filed a motion to show cause why Mr. Thiac should not be ordered to vacate the premises known as the "Garment Factory". In answer to the Motion and Order to Vacate, Mr. Thiac urged that he had become a legal and valid tenant through an assignment, sublease and/or a novation substituting himself for Cute Togs.
After hearing on the motion, the trial court ruled in favor of the City, ordering Mr. Thiac to vacate the premises. Mr. Thiac appealed the trial court judgment assigning the following errors:
I. The trial court committed an error of law in failing to find a novation occurred substituting E. Brandt Thiac and New Hope Industries, Inc. as lessee in place of Cute Togs of New Orleans, Inc.
II. The trial court committed an error of law in failing to recognize E. Brandt Thiac as the assignee of the lease.
III. The trial court committed an error of law in applying the State Open Meetings Law (LSA-R.S. 42:1, et seq.) and the laws concerning the lease of property by a municipality (LSA-R.S. 33:4712) to the facts of the case at bar.
IV. The trial court committed manifest error in failing to determine that the City of Donaldsonville was equitably estopped from evicting E. Brandt Thiac from the leased premises.
Before addressing the issue of whether Cute Togs assigned the lease to New Hope we must determine whether, in fact, Cute Togs exercised its option to renew its lease in 1983. Based on the following evidence we conclude that Cute Togs did renew its principal lease for an additional five years, extending the lease to November of 1988.
The record reveals that the City received two letters from Cute Togs in August of 1983, attempting to renew its lease. The August 9, 1983 minutes of the Donaldsonville City Council meeting, filed into evidence, reflect that the City received a letter from Cute Togs requesting permission to construct an addition to the garment factory, at its expense, and asked to renew the existing lease for five years with three five-year options at the existing rental of $250.00 per month. The City Council took this request under advisement and apparently never acted upon it.
Sometime after this initial request for a renewal, contingent on permission to build and to extend the original lease options, the City received another letter simply informing the City that Cute Togs wished to exercise its first option to extend the lease for an additional five years. Although neither letter was introduced into evidence, the testimony of Mayor Bourg verifies that the City did receive a second letter in August of 1983, renewing the lease. Furthermore, Mayor Bourg's testimony was corroborated by the following testimony of Mr. Thiac.
Q. Now, during 1983 are you aware of any effort on the part of Cute Togs to extend the term of their lease with the City of Donaldsonville?
*1114 A. Yes. They had an option. They exercised an option. I hand delivered the letter to Mr. Clay Perkins.
Q. Did you have an opportunity to read that letter?
A. Yes. It stated that we would exercise the option to renew it for five more monthsfive more years, rather.
Q. And that was done in August of 1983?
A. I think it's around that, yes.
Finding that Cute Togs did in fact renew its original sublease, we must now determine if any agreement existed between Cute Togs and New Hope or Mr. Thiac which permitted a sublease or assignment from Cute Togs, and if not whether the City, through the actions of its officers, intended a novation of the original sublease to New Hope or Mr. Thiac.
The evidence shows that once Cute Togs renewed the lease it continued to operate its garment manufacturing business until December of 1983, and continued to pay rent until March of 1984. Without contacting the City, Cute Togs vacated the garment factory in March of 1984. That same month, without formal council approval, New Hope started paying the rent on the garment factory and shortly thereafter began operating a garment manufacturing business. Mr. Thiac testified that the then elected mayor and city council were aware of and approved New Hope's occupancy of the garment factory. This testimony was not contradicted. It was stipulated that the City accepted rent from New Hope and Mr. Thiac. Based on these facts, and the following testimony of Mr. Thiac, he alleges that Cute Togs assigned or subleased the garment factory to New Hope, Inc.
Q. At any time did you ever obtain either in your name or in New Hope Industries Inc. an assignment or sublease from Cute Togs of New Orleans, Inc.?
A. No.
Q. Was it ever your intention to be bound by the terms of the Cute Togs lease with the City of Donaldsonville?
A. I thought when I started paying the lease, the monthly of the lease on the building, that I had assumed that lease.
Q. Did you ever go forward and have this assumption that you thought you had approved by the City Council of Donaldsonville?
A. No, because nobody objected to me doing it. Nobody said anything about me paying the lease money.
. . . .
Q. What arrangement did you have with Cute Togs of New Orleans, Inc. for the use of the building while you were operating as either New Hope Industries, Inc. or as Brandt Thiac?
A. It was not discussed. All I did was lease equipment from them.
Q. Did you have any consent or any permission by Cute Togs the corporation, to continue occupancy of that building?
A. Sidney, evidently it must be true, because they leased the equipment to me and they didn't throw me out.
Q. But did theydid Cute Togs of New Orleans, Inc., the corporation, give you any authority or write you a letter or tell you that they are giving you permission to use that building under the auspices of their lease?
A. No.
. . . .
Q. In July of 1985, when you took over as Brandt Thiac, did you attempt to get Cute Togs of New Orleans, Inc. released of all of its obligations under the lease which you are assuming?
A. It was assumed that they were released once the City took my checks and once the City took my money.
BY THE COURT
Q. When you say you were assuming that they were released, had you ever read that lease that Cute Togs had?
A. No, sir. Not really. Not at the time. I readit was at a later date that I got a copy of the lease.
Q. Did you later become aware of language in that lease that says that even if they got somebody to assume it that they remained bound?
A. Your Honor, I didn't pay that much attention to it. All I know is that I paid the money
*1115 . . . .
Q. And under the termsthe first term of the lease, I think, was expired in November of '83. What wasdid the operation of Cute Togs continue?
A. It continued.
Q. Until when?
A. I think around December. The first part of January was mopping up time.
Q. That would have been December of '83?
A. '83 or January of '84.
Q. Now, what happened in that time?
A. Frank McGill pulled all the working process out and brought it to Mississippi.
Q. So the operation of Donaldsonville Manufacturing [Cute Togs] ceased?
A. Ceased.
Q. To your knowledge, did Cute Togs continue to pay the rent under the lease for any period of time after December or January of 83-84?
A. They paid January and February.
Q. And what happened in February?
A. In February Frank told me he wasn't paying anymore?
Q. And what happened after that?
A. Well, I started paying in March.
Q. Did you work out any agreement with Cute Togs, with regards of your continuation of the garment factory?
A. I leased the machinery from them. I leased some machinery from them.
Q. From who?
A. From Frank McGillCute Togs.
Q. And Frank McGillwhen you say Frank McGill, you're referring to Cute Togs?
A. Cute Togs. Because at that time he bought out Norman, his partner.
Q. From your conversations with Mr. McGill was heor did you tell him that you were going to continue to operate the garment factory?
A. Yes.
Q. So he was aware of that fact?
A. Right.
Q. And he in fact leased you some of his equipment?
A. Right.
Q. Was there any specific conversation with him in regards to you taking over the Cute Togs lease with the City of Donaldsonville?
A. Nothing really. He told me he was giving up the lease, and I said, "Well, I'll assume it."
A verbal agreement which includes all essential details of a lease and is acted upon accordingly is a binding lease. Such an agreement, however, must include the essentials of a lease, namely, the thing, the price, and the consent. Bruhl v. White, 346 So.2d 734 (La.App. 1st Cir.), writ refused, 349 So.2d 1268 (La.1977); LSA-C.C. art. 2670. In this instance, the defendant failed to establish by a preponderance of the evidence that Cute Togs consented to anything. The unilateral actions of Mr. Thiac are insufficient to prove either an assignment or a sublease from Cute Togs to New Hope Industries or to Mr. Thiac. It is undisputed that neither New Hope nor Mr. Thiac ever entered into a written sublease or assignment of Cute Togs' lease. Furthermore, other than Mr. Thiac's testimony that he assumed he would take over the lease, there is nothing to suggest that Cute Togs and New Hope entered into any verbal sublease or assignment. The unsubstantiated testimony of Mr. Thiac alone is not sufficient to prove such an agreement existed.
Mr. Thiac also contends that the actions of Cute Togs and the City officials constituted a novation which substituted New Hope for Cute Togs in the original sublease. Mr. Thiac further contends that the City is estopped from denying that such a novation occurred. The City argues that due to noncompliance with the statutory requirements of LSA-R.S. 33:4712 and Section 2-10 of the Donaldsonville City Code,[3] the City was without authority to *1116 consent to a novation or create a verbal lease.
In order to prove a novation occurred in the instant case, the plaintiff must establish by clear and unequivocal proof that it was the intention of the City not only to accept New Hope and Mr. Thiac in Cute Togs' place and stead, but also to discharge Cute Togs from any further obligations under the lease. A party's intent to novate may also be established from the character of the transaction, the facts and circumstances surrounding the transaction, and the terms of the agreement itself. Huval Tractor, Inc. v. Journet, 413 So.2d 978 (La.App. 3d Cir.), writ denied, 420 So.2d 446 (La.1982).
The following articles of Louisiana Civil Code are applicable:
LSA-C.C. art. 1879
Novation is the extinguishment of an existing obligation by the substitution of a new one.
LSA-C.C. art. 1880
The intention to extinguish the original obligation must be clear and unequivocal. Novation may not be presumed.
LSA-C.C. art. 1881
Novation takes place when, by agreement of the parties, a new performance is substituted for that previously owed, or a new cause is substituted for that of the original obligation. If any substantial part of the original performance is still owed, there is no novation.
Novation takes place also when the parties expressly declare their intention to novate an obligation.
Mere modification of an obligation, made without intention to extinguish it, does not effect a novation. The execution of a new writing, the issuance or renewal of a negotiable instrument, or the giving of new securities for the performance of an existing obligation are examples of such a modification.
LSA-C.C. art. 1886
A delegation of performance by an obligor to a third person is effective when that person binds himself to perform.
A delegation effects a novation only when the obligee expressly discharges the original obligor.
The facts and circumstances of the present case do not establish a clear and unequivocal intention of the City to extinguish Cute Togs' original obligation under the sublease. Mr. Thiac contends that the City's failure to enforce the sublease upon Cute Togs, together with its acceptance of rent from New Hope and Mr. Thiac, constitutes a clear novation. We disagree. The City's decision not to pursue its rights under the sublease against Cute Togs does not evince a clear and unequivocal intent to release Cute Togs and substitute New Hope. Likewise, the mere acceptance of rent from an occupant is insufficient proof that the lessor intended a novation. We therefore find that Mr. Thiac failed to establish by clear and unequivocal proof that the City intended to release Cute Togs from the original sublease and substitute New Hope in its stead. See Bayou Accept. Corp. v. Superior Hydraulics, 446 So.2d 558 (La.App. 3d Cir.1984), wherein the Court held that a written assignment of leases "assuming all obligations or liabilities under said leases" combined with the owner's acceptance of the assignment did not amount to a novation. Since Mr. Thiac failed to meet his burden of proof, we need not decide if the City is estopped from defending his allegations of novation.
Thus far we have concluded that Mr. Thiac is not a sublessee of Cute Togs; he is not an assignee of Cute Togs; and he is not a substitute for Cute Togs by way of novation. What then is Mr. Thiac's status in regard to his occupancy of the garment factory, is he a mere occupant and if so, who is he occupying from or is he a sublessee of the City pursuant to a verbal sublease?
Because only a lessor has a right to take possession or in any way disturb the *1117 lessee, we must determine whether Cute Togs or the City was the lessor of the garment factory when New Hope began its occupancy. In view of the actions taken by Cute Togs, namely the cessation of business operations, vacating the premises without notice, failing to seek approval to sublease or assign the lease, and discontinuing rent payments, we have no difficulty in concluding that Cute Togs abandoned its sublease with the City. In so doing the corporation relieved the City of obtaining a judicial determination that the lease was cancelled. As such the City is legally deemed to be the owner entitled to invoke eviction proceedings against its occupant or sublessee. See M.A. Financial, Inc. v. Action West, Inc., 454 So.2d 1285 (La.App. 2d Cir), writ denied, 460 So.2d 610 (La.1984). When a lessee voluntarily abandons the leased premises, the lessor may retake possession without resorting to judicial process. Ogden v. John Jay Esthetic Salons, Inc., 470 So.2d 521 (La.App. 1st Cir.1985); Dardis v. Madere, 433 So.2d 322 (La.App. 1st Cir.1983), and Bunel of New Orleans, Inc. v. Cigali, 348 So.2d 993 (La.App. 4th Cir.), writ denied, 350 So.2d 1210 (La. 1977).[4]
Upon Cute Togs' abandonment of the garment factory, the City regained possession and once again became the lessor. As such the City was free to negotiate another sublease or occupancy agreement.
It is undisputed that New Hope's and Mr. Thiac's occupancy of the garment factory were never officially approved by the City Council as required under the original lease or according to LSA-R.S. 33:4712. However, the evidence clearly establishes that the City, through its councilmen and Mayor, had knowledge of New Hope's and Mr. Thiac's occupancy of the garment factory and that there was a verbal or implied approval of such.[5] Furthermore, from April of 1984 until November of 1986, the City accepted, without protest, $250.00 per month in rent from New Hope for 15 months and from Mr. Thiac for 16 months.
While these facts may support the finding of a verbal sublease between Mr. Thiac and the City, it would at most be a lease by the month, as no agreement as to duration was established by the evidence.[6] As such the lease could have been terminated by either party by the giving of notice in writing[7] to the other party at least 10 days before the expiration of the month which had begun to run.[8] Because such a lease *1118 would be terminable by either party at will, we see no need to decide whether the City is estopped from denying its ability to enter into a sublease without formal council approval.
The facts establish that on December 31, 1986, the City through its attorney gave written notice to Mr. Thiac to vacate the garment factory. Accordingly, his occupancy terminated on January 31, 1987.
For the reasons set forth above, we affirm the trial court judgment evicting Mr. Thiac. All costs of this appeal to be borne by Mr. Thiac.
AFFIRMED.
NOTES
[1] Although New Hope was not officially incorporated until April of 1984, it paid the March 1984 rent.
[2] It is important to note at this point that the councilmen who signed the variance were elected to office in July of 1985, subsequent to Mr. Thiac's occupancy of the garment factory.
[3] LSA-R.S. 33:4712 provides that before a municipality may dispose of property not needed for public purposes, an ordinance must be introduced setting out the terms of the transaction, and notice of the proposed ordinance must be advertised to afford citizens an opportunity to oppose its adoption or to apply to the court for restraining of the disposition. Furthermore, Section 2-10 of the City Code provides that an ordinance is required before the City may lease property. It is undisputed that the statutory requirements for the lease of property were not complied with.
[4] We note that the rights under a sublease are secondary to the primary lease, and a sublease ceases to exist at the moment the primary lease is dissolved. Because Cute Togs ultimately abandoned its lease, any sublease which they may have entered into would have terminated upon abandonment.
[5] Mr. Thiac stated in his testimony that in 1984 he informed the Council and Mayor of his intentions to rent the garment factory for a garment manufacturing business and that none of the officials contested it. Each of the newly elected councilmen testified that he was aware of Mr. Thiac's occupancy of the garment factory sometime in 1985, and did not object until the latter part of 1986. Mayor Bourg testified that he was also aware of Mr. Thiac's occupancy of the garment factory in 1985 and 1986, and that he verbally consented to allow Mr. Thiac to remain contingent upon his ability to organize and start a new business which would employ local residents.
[6] LSA-C.C. art. 2684 reads as follows:

The duration and the conditions of leases are generally regulated by contract, or by mutual consent.
[7] LSA-C.C.P. art. 4701, in pertinent part, reads as follows:

When a lessee's right of occupancy has ceased because of the termination of the lease by expiration of its term, action by the lessor, nonpayment of rent, or for any other reason, and the lessor wishes to obtain possession of the premises, the lessor or his agent shall cause written notice to vacate the premises to be delivered to the lessee. The notice shall allow the lessee not less than five days from the date of its delivery to vacate the leased premises.
If the lease has no definite term, the notice required by law for its termination shall be considered as a notice to vacate under this Article. If the lease has a definite term, notice to vacate may be given not more than thirty days before the expiration of the term.
[8] LSA-C.C. art. 2686 reads as follows:

The parties must abide by the agreement as fixed at the time of the lease. If no time for its duration has been agreed on, the party desiring to put an end to it must give notice in writing to the other, at least ten days before the expiration of the month, which has begun to run.